28851. TOWN OF WOODLAND *v.* CARTER CONSTRUCTION COMPANY.

DECIDED JULY 7, 1941. REHEARING DENIED JULY 30, 1941.

*G. C. Thompson, J. A. Smith,* for plaintiff in error.
*Harry S. McCowen,* contra.

STEPHENS, P. J.   Carter Construction Company, a partnership, sued the Town of Woodland, alleging in their petition substantially as follows: that the defendant is indebted to the plaintiff in the sum of $1500 on a contract for the erection of waterworks for the town, dated April 23, 1936, and copied in an exhibit to the petition; that in addition to the contract price for the work the plaintiff had furnished labor and material in a certain amount at the request and order of the defendant; that the defendant had paid a part of the amount owing but still owed the plaintiff a balance of $1500 and interest, payment of which had been demanded; and that the plaintiff had performed all obligations imposed upon the plaintiff by the terms and conditions of the contract.

The parts of the contract sued on which are material to the error alleged and which are contained in the exhibit to the petition are substantially as follows:   The time in which this contract is to be performed and the work is to be complete is of the essence of this agreement.   The contractor shall commence work within ten days, after the execution of this contract by the client, and work order issued, at such points and in such order of precedence as the engineer may from time to time approve.   The rate of progress shall be such that the whole work shall be performed in accordance with the terms of this contract on or before sixty days after work order is issued.   In the event that contractor shall fail in the due performance of all of the work to be done under this contract therefor on or before the above date, he shall pay to the client as liquidated damages the sum of ten dollars for each and every calendar day that the contractor shall be in default in the completion of the contract, which sum the client shall have the right to deduct from any moneys in its hands otherwise due or to become due to the contractor.   In case the contractor fails to complete the contract within the time fixed herein, all engineering expenses, all expenses for the inspection of the work, shall be deducted monthly by the client from the amount due him under the contract and paid to the engineers.   The engineer or his inspectors will inspect all the materials and work necessary for the building and completion of the work herein specified, and the contractor shall furnish him and his inspectors with all the needed facilities for discharging the duties assigned to them.   The plans, specifications, conditions, and regulations as amended to date are all a part of this contract.

The defendant filed an answer denying that it owed the plaintiff any amount whatever, and alleged that bidders for the construction of the waterworks were informed by publication that they could ascertain the plans, specifications, regulations, terms, and particulars on which a contract would be entered into, by obtaining copies thereof from the defendant or its agents; that the plaintiff was notified that time would be of the essence of any contract entered into, and that the contract would contain provision for the payment of liquidated damages at $10 per day for each day of delay in completing the work; that the plaintiff did not complete the performance of its contract within the time provided by the contract and was under default for a period of not less than 150 days; and that the defendant had complied in full with its part of the contract and had paid the plaintiff in full for all work and material furnished by it in addition to the work required by the contract.

The jury found for the plaintiff, and the defendant moved for a new trial on the general grounds that the verdict was contrary to the evidence and without evidence to support it, and that the verdict was decidedly and strongly against the weight of the evidence and was contrary to law and the principles of justice and equity. The judge who had tried the case died before passing on this motion, and his successor in office heard the motion and passed an order as follows: "The motion for new trial came on for a hearing on September 28, 1940, there appearing counsel for plaintiff and defendant, and after argument decision was reserved until this day. There were no exceptions taken to the charge of the court. The issues of fact were determined by the jury. Therefore it is now considered, ordered, and adjudged that the motion for new trial filed by the defendant be and the same is hereby overruled and a new trial denied. This October 23, 1940." The defendant excepted.

The only question in the case is as to the overruling of the motion for new trial which contained only the general grounds. It is not necessary to go into the evidence in great detail. J. P. Carter, a member of the plaintiff partnership, testified that when he bid for the work he was familiar with the terms, conditions, and regulations with reference to the contract and doing the work. He knew that the work was to be done under the direction of the Public

Works Administration and the town's engineer. The PWA had its engineer who made periodic inspections. The construction company contracted with the Permutit Company for water treatment equipment, as required by the specifications, which required this equipment; the company contracted for all the equipment for the waterworks. The Permutit Company furnished the water treatment equipment after the company had contracted with them for it; the construction company had to depend upon them to build the equipment in accordance with these specifications.￩ The construction company installed it by a set of plans sent to the construction company by the Permutit Company. The construction company bought the equipment strictly on the plans and specifications and had the town engineer to O. K. it before they would buy it. The town did not make any contract with the Permutit Company who were furnishing the equipment bought from them by Carter Construction Company. Carter Construction Company installed the equipment. The time they had under the contract to complete the work expired July 21, 1936. Later on it was necessary for Permutit Company to ￩send a man to Woodland because the plant would not reduce the iron content the required amount; it was about November 15 before they got the iron content reduced. The construction company finished the work on July 20, 1936, and turned it over to the town to operate, and they went to operating it and serving the people. The construction company did not do any work on the waterworks project after July 26, 1936. The Permutit Company guaranteed the iron content should be reduced to three-tenths parts per million gallons, "and we think the plant was completed and in August or something like that we had notice from the McCrary Company that the Permutit Company's equipment was not reducing the iron content. They sent a man down there to work on it at various times."

There are certain controlling facts about which there is no controversy. There was no evidence that the Carter Construction Company did any work at all on the plant at any time after the date for its completion, unless the work done by the Permutit Company is to be regarded as the work of the construction company. It is undisputed that the construction contract required the Carter Company to install the machinery or equipment manufactured by the Permutit Company. There is in the contract no guarantee by

the contractor as to the performance of the plant in regard to the chemical treatment of the water, but the contract does expressly provide in the plant and specifications, under the head "Water Treatment Equipment," as follows: "The manufacturer must have had no less than five years previous successful experience in furnishing similar equipment. The manufacturer shall furnish drawings showing the arrangement and layout of the equipment indicating the connecting lines and accessories. The manufacturer shall guarantee that the equipment furnished is of the correct capacity and the various parts are designed to operate correctly in conjunction with each other, and that if the installation is made in accordance with the drawings and operated in accordance with instructions, the equipment will remove the iron down to a maximum D. M. of 0.3 ppm and the filtered water will be clear and bright and will not deposit iron precipitates if it is allowed to stand for 24 hours. The manufacturer shall guarantee that not more than 10% of the total amount of water filtered shall be required for filter washing, and the guarantee for iron removal and amount of wash water required must accompany the bid." This shows plainly that the town meant to rely upon the guarantee of the manufacturer of the water treatment equipment and that such guarantee should accompany the bid. The record shows nothing as to whether or not the town was furnished with a guarantee by the manufacturer. In the absence of evidence to the contrary it may be assumed that it either received or waived this particular detail. There is no evidence whatever that the construction company failed in the slightest particular in carrying out the plans and specifications; the only defect alleged being a failure of the Permutit Company to reduce the iron in the water to the proper degree. The contract provided that no part of the work should be sublet without the written consent of the town. There was no evidence of any formal permission by the town to sublet the water equipment, but it is undisputed that the engineers of the town selected the manufacturer and required the contractor to buy and put in the equipment of this manufacturer. Under these facts it is clear that the contractor did not guarantee that the equipment for the chemical treatment of the water would accomplish the desired results.

Probably the jury considered that certain statements by Carter

Construction Company contained in a letter or two to the town, and a statement in a contract agreeing that the town might operate the waterworks until it was completed and accepted by the town to the effect that the construction company did not consider the contract or work completed, were made in ignorance of their rights, and, at any rate, without any consideration whatever so as to constitute a novation of the contract. The jury had the duty to pass on these admissions and consider the same in connection with the undisputed facts that the construction company was repeatedly demanding payment for the work done before the time the town formally accepted the plant. In regard to such acceptance the court charged the jury that it was not a question for them to consider what date the town accepted the system, and the proper criterion would be, when does the evidence reveal that the contract was completed by the plaintiff, and not when the Town of Woodland accepted the same. There was no exception to this instruction and therefore it stands as the law of the case on this particular point. In other words, it is immaterial in this case when the town accepted the plant.

■ The point is raised by the plaintiff in error that in overruling the motion for new trial the judge used language which showed he did not exercise his discretion in reviewing the verdict. The complete order is set out above. There may be difficulty in defining what is the discretion of a judge in reviewing a verdict on a motion for new trial based on the general grounds. Does the judge's discretion rest on his knowledge of what occurred at the trial? In the present case the judge who refused the motion did not preside at the trial. The cases cited for the plaintiff in error (*Central of Ga. Ry. Co.* v. *Harden,* 113 *Ga.* 455, 38 S. E. 949; *Thompson* v. *Warren,* 118 *Ga.* 644, 45 S. E. 912; *Scribner* v. *Adams,* 36 *Ga. App.* 754, 138 S. E. 264), are not applicable here for the reason that the trial judge did not pass on the motion, but more especially because in those cases the language used by the judge clearly showed that he had not exercised his discretion. When the presiding judge dies pending the motion for new trial his successor is required to hear and determine it. Code, §§ 24-3347, 70-103. The death of the presiding judge before the motion is heard does not automatically require a new trial. The language used in this case in overruling the motion does not neces-

sarily and affirmatively show that the judge, in overruling it, did not exercise any discretion which he may have had in the premises. The fact that he withheld his decision for nearly a month and the recital that he had considered the motion must enter into the construction of the previous language. This case therefore falls within the decisions in *Virginia Lumber Cor.* v. *Williams, 50 Ga. App.* 410 (178 S. E. 404); *Martin* v. *Bank of Leesburg, 137 Ga.* 285 (73 S. E. 387); *Seaboard Air-Line Ry.* v. *Benton, 43 Ga. App.* 495 (19) (159 S. E. 717). In *Robinson Company* v. *Rice, 39 Ga. App.* 785 (148 S. E. 542), the language used by the trial judge was, "There is some doubt in the mind of the court, under the evidence, whether Mrs. Rice sustained her defense, but the jury agreed with her version of the same. It is therefore ordered and adjudged by the court that the motion be and the same is hereby overruled and a new trial refused." The court held that this language did not clearly indicate that the judge did not use his discretion. In *Savannah Electric Co.* v. *Lackens, 12 Ga. App.* 765, 768 (79 S. E. 53), it was said that if the order of the judge is equivocal and susceptible of two constructions, that interpretation will be given it which is in consonance with the theory that the judge has performed his duty and exercised the discretion vested in him by law. It was not error to overrule the motion for new trial.

*Judgment affirmed. Sutton and Felton, JJ., concur.*