. (b) Plaintiffs have waived their claim for damages.

■ (c) Injunction should not issue enjoining the four Defendants sued herein, to-wit, A. J. Adams, George Lane, Mrs. Mattye Schulze, and R. M. Darst, and the Jaybird Democratic Association of Fort Bend County, from refusing to allow Plaintiffs to vote in such Jaybird Primaries. The evidence as stated shows that the affairs of such Association are in the hands of an Executive Committee of twenty-two persons, and not in the hands of the four Defendants who are parties to this suit. They do not have the power to either allow or not allow Plaintiffs to vote. That power is in such Executive Committee.

Let appropriate Decree be drawn and presented in accordance herewith.

**CAPITAL LIFE & HEALTH INS. CO. v. BOWERS, Collector of Internal Revenue.**

**Civ. A. No. 2275.**

United States District Court
E. D. South Carolina,
Columbia Division.

May 16, 1950.

3. Such Article is as follows:—
   "Any political party without a State organization desiring to nominate candidates for county and precinct offices only may nominate such candidates therefor under the provisions of this title by primary elections or by a county convention held on the legal primary election day, which convention shall be composed of delegates from various election precincts in said county, elected therein at primary conventions held in such precincts between the hours of eight a. m. and ten p. m. of the preceding Saturday. All nominations made by any such parties shall be certified to the county clerk by the chairman of the county committee of such party, and, after taking the same course as nominations of other parties so certified, shall be printed on the official ballot in a separate column, headed by the name of the party; provided, a written application for such printing shall have been made to the county judge, signed and sworn to by three per cent of the entire vote cast in such county at the last general election."

D. McK. Winter, Columbia, S. C., G. L. B. Rivers, Charleston, S. C., for plaintiff.

Ben Scott Whaley, U. S. Attorney, Charleston, S. C., Claud N. Sapp, Jr., Asst. U. S. Attorney, Columbia, S. C., Theron L. Caudle, Asst. Attorney General, Lyle M. Turner, Department of Justice, Washington, D. C., for defendant.

WYCHE, District Judge.

The above case having come on for hearing on February 7, 1950, before me sitting without a jury and the parties being duly represented by counsel, based upon the oral testimony, documentary evidence and admissions of the parties by their pleadings and in open court, and in compliance with Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A., I find the facts specially and state my conclusions of law thereon, as follows:

Findings of Fact

(1) This is a suit for the recovery of social security taxes totaling $7,381.21 alleged to have been erroneously assessed and collected from Capital Life and Health Insurance Company (hereafter referred to as "taxpayer") for the period commencing January 1, 1943, and ending September 30, 1948, under the provisions of the Federal Insurance Contributions Act, 26 U. S.C.A. § 1400 et seq. The suit also seeks to recover taxes and interest in the total amount of $3,953.70, alleged to have been erroneously assessed and collected from the taxpayer for the calendar years 1943 to 1947, inclusive, under the provisions of the Federal Unemployment Tax Act, 26 U.S.C.A. § 1600 et seq.

(2) Since counsel for the taxpayer accepted the Government's allegation as to the dates of payment (which were slightly different than alleged in the complaint) there are no issues in the case based upon any of the formalities which must be complied with in order to maintain an action for the recovery of internal revenue taxes.

(3) Taxpayer is a South Carolina corporation with its home office in the City of Columbia. In addition to the office in Columbia it has nineteen other offices located at various places in the State of South Carolina. Each of these offices has a manager, assistant manager and cashier who are admitted employees of the company. In still other cases, in addition to the manager, assistant manager, cashier, there is a salaried field supervisory man. In addition to the manager, assistant manager and cashier, attached to each of the district officers are a number of agents. In some districts all of the persons attached to the office are on a salary including the agents. In other districts there are some agents that work on a salary and others on commissions. In no case is there a branch office in which all of the agents work on a straight commission basis. So far as the type of work is concerned there is practically no difference between the work performed by the agents who are compensated on a salary basis and those who are compensated on a straight commission basis.

(4) The taxpayer is in the business of writing life, accident and health insurance coverage on white and colored lives in the State of South Carolina under contracts of insurance. All contractual relations are between the taxpayer and its policy holders. The premiums charged for insurance is in accordance with rates fixed by the taxpayer and all applications accepted for insurance are subject to final approval by it. The amount of insurance which the taxpayer will contract to write upon any one life is limited by it to a maximum of $1,000.

(5) The insurance premiums are payable weekly and, in most cases, do not exceed more than a few cents a week. The weekly system of payments was established by the taxpayer and is not subject to change by its agents. In some cases, however, by pre-payment on the part of the insured the collections are made by the agent at more infrequent intervals. In the event that payments are not made for a period of four weeks the taxpayer may lapse the policy under its terms. Whether the policy will be lapsed is a matter to be determined by the taxpayer.

(6) The weekly premiums are legally payable at the taxpayer's home office. Under its system of operation, however, the payments are made to one of its agents and are receipted for by them on behalf of the taxpayer. The various parts of the State of South Carolina where the taxpayer does business are divided into areas known as "debits". These areas are established primarily by the taxpayer and vary in size according to the density of the population. A fair average of the number of policies in a debit is between 600 and 700.

(7) Under the taxpayer's system of making collections the various policy holders located in a debit are listed in book form devised and furnished by the taxpayer known as an "agent's collection book". Each policy holder is assigned a page which is ruled in such a fashion that there is a space and date for each weekly premium payment. The agents must make a notation in the proper space in this book as the premium is collected on the particular policy.

(8) When the collections are made a notation must also be made by the agent on a printed card devised by the taxpayer known as a "premium receipt card", and which belongs to the policy holder. This notation indicates that the policy has been paid up for that particular week.

(9) At the end of each week the agent must prepare on a company form known as an "agent's weekly summary" a statement showing the page numbers of the policies collected on that week and the amount collected. The report also requires a summarization of the total amount of policies on which premiums were paid, the amount of such premiums, the number of policies lapsed, the number of policies issued or revived, the amount transferred to and from another debit and other information.

(10) At the same time more detailed information must be shown by the agent on a form known as a "lapse sheet" where-

in he must set forth the policy number, name of insured, address and other information relating to policies which lapsed during the week.

(11) Where collections are transferred from one debit to another such transfers must be set forth by the agent on a company form known as a "transfer sheet".

(12) When an agent discusses the purchase of a new policy with a prospective policy holder the rates must be quoted from a "rate book" furnished by the taxpayer which shows the rates established by it for various age groups. This rate book, besides carrying rates, has detailed instructions to the agents covering not only the writing of insurance but how the collecting and recording of insurance premiums, the payment of claims and dividends and such matters as lapses, revivals and transfers of policies must be handled. The rate book also carries information relating to field inspections, which inspections are made of the records and accounts kept by the agents whenever it is deemed necessary by the district manager, or the home office of the taxpayer.

(13) Whenever policies are sold by the agents they are sold entirely on the basis of the terms established by the taxpayer.

(14) Other forms prepared by the taxpayer, and required to be handled by the agents in accordance with the company procedure, are furnished to the agents such as the "application for insurance", "physician's statement of disability", and "Hospitalization claim".

(15) The commission agents are permitted by the taxpayer to make their collections without appearing in person at the company office. The salaried agents are required to report at the office each morning before leaving for their day's work. There is no requirement that the latter report at the company office in the evening.

(16) The taxpayer furnished each agent, including the commission agents, with a desk at the company office. Telephone service is made available to all agents. Some agents, however, do not use the desk which the taxpayer supplies them but are permitted to make up their reports at home, if they so desire.

(17) The agents were hired by the taxpayer without any written form of contract and are subject to discharge at any time. The agents, also, are free to quit at any time.

(18) When the relationship between the taxpayer and the agents is terminated the agents no longer have any interest in any of the business written in the "debit" to which they were assigned whether written by them or by previous agents. All records kept by the agents as set forth above belong to the taxpayer.

(19) Wherever it affects the taxpayer's interest the agents are controlled by the taxpayer as to the manner and means of performing the services for which the agents are hired. Such freedom as the agents enjoy with respect to arranging and carrying out their services is a freedom permitted to them by the taxpayer and can be denied to them if the taxpayer sees fit, without incurring any legal liability.

(20) At the time the agents are hired it is not known whether they will be paid for their services on the basis of a fixed salary or will be paid on the basis of a percentage of the collections which they make. Whether the agent will work on a salary or on a commission basis is a choice which the taxpayer allows the agents to make at the end of the regular training period through which all agents go before being given a "debit".

(21) Although the taxpayer makes no contention that the salaried agents are not its employees there is no substantial difference in the manner in which salaried agents and commission agents work, except that salaried agents are required to report to the company's office each morning. This additional control is exercised by the taxpayer in order to eliminate any tendency on the part of the salaried agents to relax their efforts since they know they will receive a fixed salary each week. By paying the commission agents a percentage of the amount which they collect each week this exercise of control by the taxpayer

604

is unnecessary where the commission agents are concerned.

(22) Under the relationship between the taxpayer and the commission agents not only does the taxpayer have the right to control and direct such agents as to the results to be accomplished by the work and as to the details and means by which the result is accomplished but the taxpayer does exercise such control to the extent that it sees fit.

(23) Some of the taxes here were collected under the Federal Unemployment Tax Act with respect to commission agents who, during some part of the calendar years involved, were compensated by the taxpayer on a salary basis. The extent to which such agents were paid a salary was, by agreement of the parties, not developed at the trial. The parties have arranged that such figures, if they become necessary, will be agreed upon and submitted by stipulation.

(24) The agents compensated on a commission basis during the years 1943 to 1948, inclusive, were employees of the taxpayer.

(25) The commissions received by the agents based upon a percentage of premiums collected was paid as remuneration for the services which they rendered to the taxpayer during the years 1943 to 1948, inclusive.

### Conclusions of Law

(1) The taxpayer's commission agents were its "employees" within the meaning of Section 1426(d), Internal Revenue Code, 26 U.S.C.A. § 1426(d); the remuneration which they received for their services were "wages" within the meaning of Section 1426(a), Internal Revenue Code; the commission agents were in covered "employment" within the meaning of Section 1426(b), Internal Revenue Code; and the taxes collected under the provisions of the Federal Insurance Contributions Act for the period from January 1, 1943, to September 30, 1948, inclusive, were properly collected.

(2) The commission agents were "employees" of the taxpayer within the meaning of Section 1607(i), Internal Reve-

nue Code, 26 U.S.C.A. § 1607(i), and, to the extent that such commission agents were compensated in part by a salary and in part by commissions, were not in "exempt employment" within the meaning of Section 1607(c) (14), Internal Revenue Code.

(3) The defendant is entitled to judgment with respect to the taxes assessed and collected under the Federal Insurance Contributions Act.

(4) To the extent that the commission agents were compensated during the calendar years in question in part by a salary and in part by commissions the defendant is entitled to judgment with respect to the taxes assessed and collected under the Federal Unemployment Tax Act.

An order may be submitted directing the entry of appropriate judgment accordingly.